# United States Court of Appeals
## For the First Circuit

No. 22-1686

UNITED STATES,

Appellee,

v.

BRIAN ORLANDELLA,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Mark L. Wolf, U.S. District Judge]

Before

Kayatta, Thompson, and Rikelman,
Circuit Judges.

John H. Cunha Jr., with whom Charles Allan Hope and Cunha & Holcomb, P.C. were on brief, for appellant.

Mark T. Quinlivan, Assistant United States Attorney, with whom Joshua S. Levy, Acting United States Attorney, was on brief, for appellee.

March 20, 2024

**THOMPSON, <u>Circuit Judge</u>**.  A jury found Brian Orlandella ("Orlandella") guilty of sexual exploitation of a minor and transfer of obscene material to a minor.  Naturally, this wasn't the outcome he wanted.  So now on appeal, Orlandella raises a five-pronged attack, hoping one of his arguments might deal the verdict a fatal blow and result in his acquittal.  None of those quintuple attacks, however, comes close to delivering a KO.  That is all to say, no reversible error occurred below so we affirm the verdict and Orlandella's convictions.

**RECAP**

For context, we start with a factual and procedural recap of Orlandella's case.  Two things to note right off the bat.  First, because Orlandella challenges (among other things) the sufficiency of the evidence against him and the denial of a motion to suppress, we recount the facts in the light kindest to the verdict and the district court's suppression ruling.  <u>United States</u> v. <u>Burgos-Montes</u>, 786 F.3d 92, 99 (1st Cir. 2015).  And second, our recap hits only the highlights necessary to understand the issues on appeal.  Any other remaining details will be provided elsewhere on an as-needed basis.

## 1. The Crime

In May 2018, Orlandella was using the Kik messenger app[1] under the username of "gianninyny." Two members of a group titled "Littles and Doms," Orlandella and another user ("Minor A"),[2] under the username of "pineapples1118" and display name of "Daddy's little princess," exchanged many private, one-on-one messages. While their messages (which were explicitly sexual throughout) began on May 16, 2018, the messages most relevant to Orlandella's convictions started on May 18.

After Orlandella initiated a conversation with Minor A, the following exchange took place around midnight Eastern Standard Time ("EST") on May 18:[3]

> pineapples1118:  When I get home im taking a bath
>
> gianninyny:  Mmmm can u take videos for daddy?
>
> pineapples1118:  Maybe
>
> gianninyny:  Mmm good girl

---

[1] Kik is an app used for texting and exchanging information, including videos and pictures. Kik users can also join groups or start groups with other Kik users who have similar interests.

[2] As is our custom, because this appeal involves minors, we have anonymized all their names to protect their privacy. United States v. Charriez-Rolón, 923 F.3d 45, 47 n.1 (1st Cir. 2019).

[3] As will soon become clear, Orlandella was based in the EST time zone and Minor A in the Central Standard Time ("CST") time zone at the time these messages were exchanged. To complicate things even further, the messages use Universal Time Coordinated ("UTC"), which is four hours ahead of EST and five hours ahead of CST. For clarity, we'll only use EST timestamps moving forward.

pineapples1118:  [Sends video and image files not played for the jury]

gianninyny:  .mmmmmm omfg . . .

gianninyny:  Ur hot af

gianninyny:  Would u really fuck daddy?

. . .

pineapples1118:  And yes I would[.]

About an hour later, this next exchange took place:

pineapples1118:  What do you want me to do

gianninyny:  Help Daddy cum

gianninyny:  Help Daddy cum

pineapples1118:  How I need hel[p]

gianninyny:   I thought u we're Daddy's lil teen slut

pineapples1118:  Help

gianninyny:  I'll help u with pics and videos if u Wana cum too ok?

Later that same day, Minor A messaged Orlandella, "Me and my other daddy are not together" and "U are the only daddy."

The most relevant exchanges pick back up on May 19.  That day, again shortly after midnight EST, Orlandella and Minor A exchanged the following messages:

pineapples1118:  Hey

gianninyny:  Mmmmm

gianninyny:  Who did u take those for tho

- 4 -

        pineapples1118:  U

        gianninyny:  U should make Daddy a video

        pineapples1118:  Idk

        gianninyny:  Make dada a video?

        gianninyny:  Make dada a video?

Soon thereafter, Minor A mentioned that she had her "track meet . . . in 5 days," to which Orlandella responded by asking her whether "[she] ha[d] any pics or videos of [her] running?"  Around 12:30 p.m. EST, also on May 19, Orlandella sent Minor A three videos of him masturbating and messaged, "Daddy made u some videos last night" and "Hope u enjoy . . . [.]"  In these videos, Orlandella can be seen wearing a camouflage cap and blue bracelet on his wrist.  Significantly, at about 5:30 p.m. EST on May 19, Orlandella acknowledged that he was substantially older than Minor A, who admitted she was underage:

        gianninyny:  Baby how old are u?

        pineapples1118:  14

        pineapples1118:  Why

        gianninyny:  Ubsur ur ok with my age?  I'm
        like WAY older

        pineapples1118:  Ik and yea

        pineapples1118:  Yeah

        gianninyny:  What's my age?

pineapples1118:  I dont remember but us it around 30[.][4]

Moving on to May 20 and 21.  In a conversation initiated by Orlandella around 11:00 p.m. EST on May 20 and continuing through 1:00 a.m. EST on May 21, the following messages were exchanged:

gianninyny:  Hi

gianninyny:  Wyd?

pineapples1118:  Just got out of tub

gianninyny:  Yea????  Can Daddy see?

pineapples1118:  I used my brush hehe

gianninyny:  Mmmm yea?  Did u make any videos?

A little over a minute later, Minor A responded, "Yeah," and then sent Orlandella a 14-second video of a pubescent female partially submerged in water in a white bathtub, showing only the female's pubic area and upper thighs.  In the video, the female can be seen repeatedly inserting the handle of black hairbrush into her vagina ("hairbrush video").[5]  Less than a minute later, Orlandella messaged Minor A, "Mmmm show dada" and "Plzzzz."  In response, Minor A sent Orlandella the hairbrush video again and a picture of

---

[4] Although Minor A indicated she was fourteen, she was actually thirteen at the time.

[5] The female's face cannot be seen in the hairbrush video.

herself sitting in a white bathtub with her face and breasts visible ("bathtub picture").[6]

After receiving both the hairbrush video and bathtub picture, Orlandella asked Minor A for whom had she taken the video and picture:

> gianninyny:  Wait.  Who dafuq u take those for?
>
> pineapples1118:  No one I was waiting for u
>
> gianninyny:  Mhm
>
> gianninyny:  Why didn't u just send them to me
>
> pineapples1118:  Idk
>
> gianninyny:  Ok
>
> gianninyny:  Send more
>
> pineapples1118:  I got out I was being rushed
>
> gianninyny:  Send the vids

Seconds later, Minor A sent Orlandella the hairbrush video again.

Their conversation did not end there.  Orlandella then messaged Minor A, "Take a pic for daddy" and "Did u cum?"  After Minor A responded, "Yeah," Orlandella messaged her, "I Wana seeeee" and "Mmmm what a good girl."  Less than thirty minutes later, Orlandella sent Minor A a picture of an erect penis (again with a blue bracelet visible on Orlandella's wrist), to which she

---

[6] At Orlandella's trial, Minor A's mother identified the female in the bathtub picture as Minor A.

responded, "I wanna suck."  He followed up by telling her to "[m]ake a video of [her] sucking [her] fingers."  Minor A complied less than a minute later and sent Orlandella a video of her sucking her thumb ("thumb video").  After Orlandella noted that "the video was black," Minor A resent the thumb video with better visibility (including of her face), to which Orlandella responded, "Mmmm good girl."

Within twenty minutes, Orlandella messaged Minor A, "Daddy needs his lil teen slut to make him cum rn" and sent her a video of him touching his penis over his shorts (again with a blue bracelet visible on his wrist).  Directly after him sending that video, they had the following exchange:

pineapples1118:  Mmm yes

gianninyny:  U like

pineapples1118:  Yes

pineapples1118:  Always do

gianninyny:  Good girl

gianninyny:  Am I the hottest daddy ever?

pineapples1118:  Yed

pineapples1118:  Yes

gianninyny:  Baby.  Help Daddy cum

pineapples1118:  How

gianninyny:  I want nudes. . .  And for u to talk like Daddy's dirty slut ok?

As she did before, Minor A responded by resending the hairbrush video. Orlandella responded with "Mmm yes," but lamented that she had "already sent that tho."

As their conversation continued, Orlandella asked Minor A, "Where [she] want[ed] Daddy's cum," to which she followed up with a picture that could not be clearly made out and with a message saying "[i]n mouth." Displeased with that hard-to-see picture, Orlandella complained, "Baby more light. . . And video it pussy." Again, Minor A complied with Orlandella's request and sent him a picture of a naked, pubescent female sitting on a toilet, using two of her fingers to spread her labia ("digit picture").[7] In quick, back-to-back messages, Orlandella responded with "Mmmmm good girl," "Such a good lil teen slut," and "Make daddy a video of that tight teen cunt." Slightly more than a minute later, Minor A complied once more and sent him a 14-second video of a naked, pubescent female sitting on a toilet, showing only her genital area. In the video, the female can be seen touching her genitals and inserting her fingers into her vagina ("digit video").[8] Still wanting more videos and pictures of Minor A, Orlandella responded, "Mmmmm don't u stop" and "Plz more." Although Orlandella and Minor A exchanged several more messages

---

[7] The female's face cannot be seen in the digit picture.

[8] As was the case with the hairbrush video and digit picture, the female's face cannot be seen in the digit video.

between each other, the messages most relevant to his convictions end there, and the conversation ended at approximately 1:00 a.m. EST on May 21.

### 2. The Investigation in Texas

It wasn't long before a criminal investigation was underway because, later that night, while Minor A and her family were staying at a motel in Beaumont, Texas, Minor A's brother woke their mother and told her to open Minor A's phone. Finding inappropriate messages, videos, and pictures on Minor A's cellphone, and scared for her daughter's safety, Minor A's mother held onto the cellphone overnight. The next day, the family returned to their home in Port Neches, Texas, and Minor A's mother contacted the police department there and gave Officer Scott Thompson ("Officer Thompson") Minor A's cellphone, along with the cellphone of Minor A's twelve-year-old sister ("Minor B").[9] Minor A's mother told Officer Thompson that Minor A had been using the cellphone to message older men and then gave him permission to search both girls' cellphones.

Back at the Port Neches police station, Officer Thompson turned over both cellphones to then-Detective (and by trial, Sergeant) Cheri Griffith ("Sergeant Griffith"). After getting

---

[9] The precise nature of Minor A's familial connection to Minor B is a bit unclear, but we take our lead from the parties and trial testimony that they are biological sisters.

- 10 -

Minor A's mother's permission to download the content on the cellphones, Sergeant Griffith scrolled through Minor A's Kik app, observed online messages (including videos and pictures) exchanged between Minor A and gianninyny, took screenshots of the messages, and recorded the videos with another cellphone. As Sergeant Griffith perused Minor A's Kik app, she also found messages between Minor A and another user, under the username of "SirGabe." According to Sergeant Griffith's May 22, 2018 report:

> In [Minor A's] communication with SirGabe, [Minor A] sends nude videos and photos to him. He sends her videos but none are nude. In some of his messages SirGabe tells [Minor A], "Now spread them and let me see what I want," and he tells her to play with herself.

Sergeant Griffith finished her search of Minor A's cellphone particularly concerned that an in-person meet-up between Minor A and gianninyny might have been planned because of messaging that suggested as much, so she met with Minor A and Minor B on May 23, 2018 at the police station as part of a safety check.[10]

With the Minors' safety assured and the confirmation that no meet-up was in the works, Sergeant Griffith turned her attention to identifying gianninyny. She started off by issuing a subpoena to Kik for the user information associated with the

---

[10] Sergeant Griffith spent about fifteen minutes speaking with each girl separately and Minor A's mother and Minor B's legal guardian, who gave permission to the police to speak with each girl, were not present when either girl was questioned.

gianninyny account. The Kik-provided documents indicated that a Motorola Android XT1635 cellphone was used to register the gianninyny account, the account was registered within the United States and in the EST time zone, and that there were two IP addresses[11] associated with the account. One of those IP addresses was assigned to Comcast Cable so Sergeant Griffith subpoenaed that company for the subscriber information specific to that IP address. The Comcast-Cable-provided documents indicated that Orlandella was the subscriber for that IP address, with a service address in Beverly, Massachusetts.

With a potential suspect identified, Sergeant Griffith referred the case to the Homeland Security Investigations ("HSI") field office in Beaumont, which then referred the case to the HSI field office in Boston.

### 3. The Search, Interview, and Arrest

The Boston-based investigation moved right along and, on December 3, 2018, HSI agents searched Orlandella's home in Beverly, pursuant to a search warrant.

---

[11] For the less technologically in-the-know, an IP address "is merely a string of numbers associated with a device that had, at one time, accessed a wireless network. And . . . an internet user generates the IP address data . . . only by making the affirmative decision to access a website or application." United States v. Morel, 922 F.3d 1, 9 (1st Cir. 2019) (internal citation and quotation marks omitted).

At 6:00 a.m., a team of twelve to fourteen HSI agents, including members of the HSI Special Response Team, arrived at Orlandella's home to execute the search warrant. These agents were dressed in military-style clothing and were carrying rifle-style weapons and holstered handguns. After breaking down the door to the home, firing a flash grenade, pointing their rifles at Orlandella, and handcuffing him, the agents brought him outside for about fifteen to twenty minutes while they secured the scene. With the scene secured, the agents took Orlandella back into the apartment and at some point removed his handcuffs. They told him that he was not under arrest at that point, but he was not allowed to move within the apartment without an escort, nor speak with his wife or his son who were home at the time of the search, nor take his son to school, nor go to work.

Once Orlandella was moved to the kitchen, HSI Special Agents Joseph Iannaccone and Andrew Kelleher ("SA Iannaccone" and "SA Kelleher," respectively) interviewed him. At the start of the interview (which was recorded), SA Iannaccone left for a few minutes to retrieve a one-page form explaining Orlandella's Miranda rights[12] and a waiver of those rights. While he was gone, SA Kelleher and Orlandella had the following exchange:

---

[12] Miranda rights refer to "certain Fifth Amendment rights[,] including the right to remain silent and the right to consult an attorney," which law enforcement officers must advise suspects of

- 13 -

SA Kelleher:  It's part of our process. The next thing we do is – No one is under arrest, no one, no one's in custody.  You don't have to speak with us, but we do want to read you your Miranda rights so you understand what your rights are.  So we have, we have a form that, you know I can read it to you, you can read it yourself and then, if you're so inclined, then we can sign it.  That's. . .

Orlandella:  Okay.

SA Kelleher:  He's just going to go grab one of those forms, so. . .

Orlandella:  Okay.

SA Kelleher:  We'll just do that before we start.  And, you know, even if you decide you want to sign that and you want to stop at any time.  That's what we'll do.

Orlandella:  Mm-hmm.

While SA Iannaccone was gone, SA Kelleher and Orlandella engaged in small talk.

SA Iannaccone returned with the Miranda form, which we'll reproduce in its entirety here so that everyone is on the same page:

### STATEMENT OF RIGHTS

Before we ask you any questions, it is my duty to advise you of your rights:

You have the right to remain silent.

---

"before interrogating [them] in a custodial setting."  United States v. Carpentino, 948 F.3d 10, 20 (1st Cir. 2020).

- 14 -

Anything you say can be used against you in a court of law or other proceedings.

You have the right to consult an attorney before making any statement or answering any questions.

You have the right to have an attorney present with you during questioning.

If you cannot afford an attorney, one will be appointed for you before any questioning, if you wish.

If you decide to answer questions now, you still have the right to stop the questioning at any time, or to stop the questioning for the purpose of consulting an attorney.

### **WAIVER**

I have read, or someone has read to me, this statement of my rights and I understand what my rights are. At this time, I am willing to answer questions without a lawyer present.

The form also included lines at the bottom of the page where the suspect (here, Orlandella) and witnesses (here, SA Iannaccone and SA Kelleher) can sign to signal their waiver of these rights.

With the form in hand, the following exchange took place:

SA Iannaccone: Alright so I'm sure [SA Kelleher] mentioned you're not under arrest right now, okay. We're just interested in talking to you.

SA Kelleher: Would you like me to read this out loud or do you want to read it to yourself?

Orlandella: No, I know what it is.

SA Kelleher: Okay, great.

Orlandella: Can I use your pen please Sir?

- 15 -

SA Iannaccone:  Oh yes, yup.  Here you go.

SA Kelleher:  And I think it's obvious but do you, you read and write English well, I would assume

Orlandella:  Mhmm

SA Kelleher:  Haha, I just have to ask you that.

[Sounds of pen moving across paper]

SA Kelleher:  Uhh. . . it's the third. December third.

SA Kelleher:  Let's witness this

[Sounds of pen moving across paper]

Based on the recorded interview, Orlandella had the form for about thirteen seconds before he signed it.

Having waived his Miranda rights, the interview proceeded.  During the course of that interview, Orlandella made several incriminating (yet equivocal) statements, including that (1) he had previously used the Kik app; (2) it was possible that he might have used Kik to send and receive pictures; (3) he was the adult male wearing a camouflage cap depicted in gianninyny's profile picture; (4) he thought he remembered using the username gianninyny; (5) he could have taken one of the videos that SA Kelleher and SA Iannaccone showed him; and (6) some of the videos sent from gianninyny to Minor A depicted his upstairs bathroom.

The search of Orlandella's home also turned up (among other things) two Motorola XT1635 cellphones -- one newer ("the newer cellphone") and an older one with a broken screen ("the broken-screen cellphone") -- and a blue bracelet with pink writing and the breast cancer symbol ribbon on it.  After Orlandella consented to a search of his car, the agents additionally seized a camouflage cap from the rear seat.

Once the interview and search ended, Orlandella was arrested and later arraigned.

## 4. The Forensic Analyses

Following Orlandella's arrest, Boston-based law enforcement continued the investigation with forensic analyses, first, of a cellphone thought at that time to be Minor A's, but in fact, belonged to Minor B, and, second, of Orlandella's cellphones. Starting off with Minor B's misidentified cellphone, HSI Task Force Officer Randy DeMello ("TFO DeMello") found that Kik had been installed on the cellphone and Minor B had used the app, under the username of "Rose" or "Rose17389."  The only evidence relating to Orlandella, though, was a single message from gianninyny, consisting only of the word "hey."[13]  The analysis of Minor B's cellphone also retrieved the following:  (1) "a 23-second-long video consisting of what appears to be a naked female minor

_____

[13] Orlandella was never charged for any crime in relation to Minor B.

inserting and removing the handle of her hairbrush from her rectum," created on May 16, 2018; (2) a picture of a "naked female minor with a hair brush protruding from her rectum," created on May 16, 2018; (3) "a 38-second video of a naked female minor with a pink pacifier in her mouth rubbing her naked breasts," created on May 17, 2018; and (4) "a 31-second video of a naked female minor inserting and removing the handle of a hairbrush from her mouth," created on May 18, 2018.[14]

Turning to Orlandella's two cellphones, TFO DeMello's analysis involved searching the cellphones for the term "kik." The search of the newer cellphone turned up a picture of Orlandella in the bathroom with a shirt pulled up just above his chest, naked from the waist down, with one hand covering his genitals and the other hand holding the camera and taking a picture in the mirror. In the picture, Orlandella is seen wearing a camouflage cap and a blue bracelet. This picture was located in a Kik temporary folder, which meant that Kik had previously existed on the device. The analysis of Orlandella's newer cellphone also turned up a picture of Orlandella sitting on a toilet with a blue bracelet on, seemingly masturbating. Crucially, gianninyny's profile picture was also found on the same cellphone. The analysis of the broken-

---

[14] As the videos and picture on Minor B's cellphone are not in the record, the descriptions that appear here are lifted from TFO DeMello's testimony at trial.

screen cellphone revealed that Kik had been previously installed on it as well.

It wasn't until August 2020 that the government realized Minor B's cellphone had been mistakenly analyzed, instead of Minor A's. Accordingly, Minor A's cellphone was then sent from Texas to Boston for a forensic analysis. This analysis revealed that Minor A owned the cellphone and the Kik account, pineapples1118, with the display name of "Daddy's little princess," existed on the device. The messages, videos, and pictures exchanged between gianninyny and pineapples1118 detailed above were also found.

### 5. The Trial and Its Lead-Up

On January 3, 2019, Orlandella was indicted on two counts, the first count charging him with sexual exploitation of a minor, in violation of 18 U.S.C. § 2251(a) and (e)[15] ("Count One"), and the second count charging him with transfer of obscene material to a minor, in violation of 18 U.S.C. § 1470 ("Count Two"). The counts charged him with both the completed crimes and the attempts (i.e., that he actually did the crimes and that he tried to commit them as well). Convinced the police acquired his statements and other evidence against him in violation of his constitutional rights, Orlandella filed three motions to suppress

---

[15] We'll get into this more in just a second, but Section (a) outlines the substantive offense, while Section (e) provides the penalty for those found guilty of this crime.

in 2020, seeking to suppress his statements to SA Iannaccone and SA Kelleher and evidence seized from his car and home. The district court didn't buy any of what Orlandella was peddling and denied all three motions across the board.

With none of that evidence suppressed, the case against Orlandella marched on towards an eventual trial.[16] During the trial, once the government finished presenting its evidence (including everything outlined above), Orlandella's lawyer moved for a judgment of acquittal, which the district court denied. At the close of all evidence,[17] he renewed that motion, and the district court deferred rendering a decision until after the jury had reached its verdict. Following a six-day trial, a jury found Orlandella guilty on both counts. A verdict having been reached, the district court denied the renewed motion.

A few months later, at Orlandella's sentencing hearing, the district court meted out concurrent terms of immurement of 204 months on Count One and 120 months on Count Two, followed by concurrent terms of 60 and 36 months, respectively, of supervised release. Certain that the jury got it wrong and that the district

---

[16] After a December 2021 trial had to be mistried and continued due to a medical issue Orlandella's lawyer had, a second trial began on April 12, 2022.

[17] After the government presented its case, Orlandella's lawyer indicated to the district court that he did not plan to present any evidence.

court made multiple mistakes along the way, Orlandella brought the case to us through a timely notice of appeal.

## OUR TAKE ON ORLANDELLA'S ARGUMENTS

Up top, we mentioned that Orlandella raises five arguments on appeal as to why the verdict and his convictions don't hold water. We'll provide the details as we go, but here's the SparkNotes version of his arguments: (1) the government presented insufficient evidence to support his conviction on Count One; (2) the district court erred by giving the jury a general unanimity instruction on Count One; (3) the government violated its disclosure obligations by failing to turn over evidence -- namely, Minor A's messages with SirGabe and the videos and picture found on Minor B's cellphone; (4) the district court erred by failing to give the jury a missing witness instruction[18] regarding the government's failure to call Minor A as a witness; and (5) the district court erred in denying his motion to suppress the statements he made to SA Iannaccone and SA Kelleher during the

---

[18] For those new to trials, a missing witness instruction is an "instruction [that] informs the jury that a party's failure to produce a particular witness may justify the inference that the witness'[s] testimony would have been unfavorable to that party." Latin Am. Music Co. v. Am. Soc'y of Composers, Authors, and Publishers, 593 F.3d 95, 101 (1st Cir. 2010). The logic behind such an instruction is that "the failure of a party to produce available evidence that would help decide an issue may justify an inference that the evidence would be unfavorable to the party to whom it is available or whom it would ordinarily be expected to favor." United States v. St. Michael's Credit Union, 880 F.2d 579, 597 (1st Cir. 1989) (citation omitted).

interview on the day of his arrest.[19]  What follows is our take on each of these arguments, one by one, with (several) interruptions to explain the standard of review for each argument and to provide additional relevant details (where necessary).

### 1. Sufficiency of the Evidence

We start off with Orlandella's complaint about the sufficiency of the evidence the government produced in support of Count One, but before jumping into all that, we lay out our standard of review and address a standard-of-review-related quirk this argument presents.

---

[19] We address Orlandella's arguments in this order for a variety of reasons, not the least of which is the fact that "if [Orlandella] prevails on the insufficiency argument, . . . we need not explore any of the other . . . errors raised" because the Double Jeopardy Clause would attach and "preclude[] a second trial".  United States v. Pérez-Greaux, 83 F.4th 1, 12 (1st Cir. 2023) (citations and internal quotation marks omitted).  In this case, though, Double Jeopardy would preclude a second trial only of Count One because Orlandella's sufficiency-of-the-evidence argument explicitly targets only Count One.  As a matter of fact, it is unclear to us whether Orlandella is even challenging his conviction on Count Two at all in any aspect of his briefing.  To explain, we know that his first three arguments (i.e., sufficiency of the evidence, unanimity instruction, and disclosure obligations) are all geared only towards Count One, because Orlandella himself said as much.  In his briefing of the last two arguments (i.e., missing witness instruction and the denial of his motion to suppress), however, he does not reference Count Two specifically but states that those alleged errors require a new trial (without specifying if that is only as to Count One, Count Two, or both).  Regardless, as our analysis of all the issues will soon show, no reversible error occurred below.  So, to the extent Orlandella was ever challenging Count Two, his arguments fail for the reasons we will get into shortly.

## A.  Standard of Review

Preserved sufficiency challenges (i.e., those properly raised before the district court) are reviewed de novo, while unpreserved sufficiency challenges (i.e., those making their debut on appeal) are reviewed "for 'clear and gross injustice,'" "a particularly exacting variant of plain error review."  United States v. Falcón-Nieves, 79 F.4th 116, 123-24 (1st Cir. 2023) (citations and internal quotation marks omitted).  So the question is, did Orlandella preserve his sufficiency challenge?  The answer -- it turns out -- is a bit murky.  Let us explain.

As we noted above, Orlandella first moved for a judgment of acquittal as to Count One both at the close of the government's case and of all evidence.  These motions were made pursuant to Federal Rule of Criminal Procedure 29(a).  But that wasn't the end of the story.  Two weeks after the trial ended, Orlandella filed another motion for a judgment of acquittal, this time pursuant to Federal Rule of Criminal Procedure 29(c).[20]  This motion, though, was narrower in scope, because it challenged only the sufficiency of the Count One evidence as to whether he committed the crime of sexual exploitation of a minor (not whether he attempted to commit

---

[20] The primary difference between a motion for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29(a) verses 29(c) is timing; the former is filed before a case is submitted to the jury for deliberation and the latter is filed after the jury reaches a verdict or is otherwise discharged. Compare Fed. R. Crim. P. 29(a) with Fed. R. Crim. P. 29(c).

the crime).   In denying Orlandella's motion, the district court noted this explicitly:  "In neither the Motion nor the supporting memorandum does the defendant address the fact that, as the court instructed without objection, the jury could have properly convicted him for merely attempting to commit the crime charged in Count One."  "In any event," the district court concluded, "there was ample evidence for the jury to find beyond a reasonable doubt that the defendant committed the offense charged in Count One and also that he attempted to commit that crime."

So this all poses a second question:  Where Orlandella did not raise all the grounds for acquittal in his Rule 29(c) motion that he raised in his Rule 29(a) motions, did he adequately preserve his sufficiency challenge as to all aspects of his Count One conviction?  Bottom line, today's case gives us no pressing reason to decide this issue as we opt to follow the sensible approach taken by the Fifth Circuit in United States v. Pendleton, 761 F. App'x 339 (5th Cir. 2019) (per curiam), when it was confronted with the same issue.  There, the Fifth Circuit decided to sidestep the preservation issue entirely because the defendant's sufficiency challenge failed even under de novo review.  Id. at 345-46; see also United States v. Gottesfeld, 18 F.4th 1, 6 (1st Cir. 2021) (affirming exclusion of time under the Speedy Trial Act and indicating that "we need not decide what standard of review applies because we see no error, plain or

otherwise, in the district court's decision").  The same is true here, as we will explain in just a minute.  This result is not entirely surprising because "[d]efendants challenging convictions for insufficiency of evidence face an uphill battle on appeal." United States v. Millán-Machuca, 991 F.3d 7, 17 (1st Cir. 2021) (alteration in original) (citations omitted).  That is so because, even under de novo review, "[w]e draw all reasonable inferences from the evidence in the light most favorable to the prosecution" and "[o]ur inquiry focuses on whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Id. (citations and internal quotation marks omitted).

## B.  Analysis

With our de-novo lenses globbed on, let's plunge into our review, starting with whether there was sufficient evidence such that a rational jury could have found Orlandella committed the crime of sexual exploitation of a minor.  We'll turn to whether a rational jury could have found he attempted to commit that crime in a few pages.  (Bear with us.)

Recall that Count One charged Orlandella with sexual exploitation of a minor, in violation of 18 U.S.C. § 2251(a) and (e).  As earlier mentioned, Section (e) provides the penalty for those found guilty of this crime, while Section (a) outlines the substantive offense:

> Any person who employs, uses, persuades, induces, entices, or coerces any minor to engage in . . . any sexually explicit conduct for the purpose of producing any visual depiction of such conduct or for the purpose of transmitting a live visual depiction of such conduct, shall be punished as provided under subsection (e), if such person knows or has reason to know that such visual depiction will be transported or transmitted using any means or facility of interstate or foreign commerce . . . .

18 U.S.C. § 2251(a). So, to convict Orlandella of this crime, one of the elements the government needed to prove beyond a reasonable doubt -- and this is the only element with which he quibbles -- was that he "employ[ed], use[d], persuade[d], induce[d], entice[d], or coerce[d]" Minor A into producing pictures and videos of herself "engag[ing] in . . . sexually explicit conduct." Based on our record review, we comfortably conclude that the evidence was sufficient for a rational jury to have found this element beyond a reasonable doubt.

As an initial matter, the parties agree that only three of the videos and pictures Minor A produced -- namely, the hairbrush video, digit picture, and digit video -- are at issue in Count One and meet the statutory definition of "sexually explicit conduct."[21]  Their agreement on this point is for good reason.

---

[21] Even though the parties agree that these videos and picture meet the statutory definition of "sexually explicit conduct," we take a moment to explain the rationale underpinning this point of agreement as it gives context to the reasoning behind our rejection of Orlandella's other challenges.

- 26 -

"[S]exually explicit conduct" is defined, in relevant part, as "masturbation" or "lascivious exhibition of the anus, genitals, or pubic area of any person."  18 U.S.C. § 2256(2)(A)(iii), (v). "[L]ascivious" is a "commonsensical term," which is, in turn, defined by reference to the following nonexclusive list of factors:

> (1) whether the genitals or pubic area are the focal point of the image; (2) whether the setting of the image is sexually suggestive (i.e., a location generally associated with sexual activity); (3) whether the child is depicted in an unnatural pose or inappropriate attire considering her [or his] age; (4) whether the child is fully or partially clothed, or nude; (5) whether the image suggests sexual coyness or willingness to engage in sexual activity; and (6) whether the image is intended or designed to elicit a sexual response in the viewer.

Charriez-Rolón, 923 F.3d at 52 (alterations in original) (citations and internal quotation marks omitted).

To remind, the hairbrush video, digit picture, and digit video involved the repeated insertion of a hairbrush into a pubescent female's vagina and the digital manipulation of a pubescent female's labia and vagina.  These visual depictions involve masturbation; it suffices to say that the female stimulates her genitals either with a hairbrush or her fingers in a manner intended to arouse sexual pleasure.  Alternatively, these videos and picture constitute the "lascivious exhibition of the . . . [female's] genitals . . . [and] pubic area."  18 U.S.C. § 2256(2)(A)(v).  Indeed, in each depiction, the female's legs are

- 27 -

parted and the pubic area is plainly visible, thereby making her "genitals [and] pubic area . . . the focal point." Charriez-Rolón, 923 F.3d at 52 (citation omitted). And it is enough to note that the female is fully nude and displays her genitals and pubic area in a manner intended to sexually arouse the recipient. See id. (considering "whether the child is fully or partially clothed, or nude" and "whether the image is intended or designed to elicit a sexual response in the viewer" in the sexually-explicit-conduct calculus). All told, a reasonable jury could conclude that the hairbrush video, digit picture, and digit video fit the sexually-explicit-conduct bill. See id. at 53 ("When images . . . show young children almost always fully nude and engaging in activities that display their genitalia in a manner that a jury reasonably could deem to be intended to sexually arouse the viewer, that is enough to show that the images are lascivious." (cleaned up and citation omitted)); United States v. Frabizio, 459 F.3d 80, 86 (1st Cir. 2006) (determining pictures were "lascivious" where, inter alia, "each of the girls' legs are parted and the pubic area is visible," so the pictures "could reasonably be seen as focusing on or particularly drawing attention to the girls' pubic areas and, specifically, to their vaginas").

But while Orlandella agrees with the government on the sexually-explicit-conduct nature of the hairbrush video, digit picture, and digit video, he disagrees and disagrees strongly with

whether a reasonable jury could have concluded he "employ[ed], use[d], persuade[d], induce[d], entice[d], or coerce[d]" Minor A into producing those videos and picture. For his part, he alternatively argues, first, that someone else "employ[ed], use[d], persuade[d], induce[d], entice[d], or coerce[d]" Minor A into producing them and/or, second, that Minor A sent them of her own free will and did not need any convincing from Orlandella or anyone else.

For our part, we believe a reasonable jury could have concluded Orlandella "persuade[d]"[22] Minor A to produce the hairbrush video, digit picture, and digit video. While not statutorily defined, dictionaries define "persuade" as "to move by argument, entreaty, or expostulation to a belief, position, or course of action" and "to plead with: urge." Persuade, Merriam-

---

[22] Take note that 18 U.S.C. § 2251(a) lists other ways by which a would-be defendant could violate the statute, including "employs, uses, . . . induces, entices, [and] coerces." 18 U.S.C. § 2251(a). We need not decide whether any of these other verbs applies to the facts at issue here because, as our analysis will soon show, "persuades" more than does the trick. Additionally, the parties don't agree on whether the district court's jury instructions properly included all those ways of violating the statute. On the one hand, Orlandella argues that because the district court's jury instructions omitted "employs" and "induces," the jury could not have relied on either one in rendering its verdict. On the other hand, the government argues Orlandella waived this point and, in any event, other parts of the district court's jury instructions clued the jury in as to "induce." There's no need, though, for us to wade into these waters because the parties do not dispute the district court's jury instructions properly included "persuades."

Webster Online Dictionary (Mar. 13, 2024) https://www.merriam-webster.com/dictionary/persuade [https://perma.cc/SHM4-Z95K] (emphases added);[23] see also Persuade, Oxford English Dictionary Online (Mar. 13, 2024) https://www.oed.com/dictionary/persuade_v ?tab=meaning_and_use#30978974 [https://perma.cc/852W-CDJR] (defining "persuade" as, inter alia, "[t]o urge successfully to do something; to attract, induce, or entice to something or in a particular direction" and "to talk into . . . a course of action, position, etc.").  Here, the record is chock-full of examples of Orlandella entreating, pleading with, and urging Minor A to send him videos and pictures of her engaging in sexually explicit conduct.  The following is an illustrative list of his messages doing just that:  "Mmmm can u take videos for daddy?"; "Help Daddy cum"; "U should make Daddy a video"; "Make dada a video?"; "Yea???? Can Daddy see?"; "Mmmm yea?  Did u make any videos?"; "Mmmm show dada"; "Plzzzz"; "Keep trying"; "Send more"; "Send the vids"; "Take a pic for daddy"; "I Wana seeeee"; "Yea?  Make a video of u sucking ur fingers"; "Daddy needs his lil teen slut to make him cum rn"; "Try more love"; "Baby.  Help Daddy cum"; "I want nudes . . .  And for u to talk like Daddy's dirty slut ok?"; "Baby more light . . . And video it pussy"; "Make daddy a video of that tight teen cunt"; "Mmmmm don't u stop"; and "Plz more."

---

[23] We pause here to note that Orlandella himself agrees with this definition of "persuade."

- 30 -

Turning specifically to the messages immediately surrounding the hairbrush video, digit picture, and digit video, a reasonable jury could have also concluded that they were produced in response to Orlandella's requests, entreaties, and pleas. Starting with the hairbrush video, after Minor A tells Orlandella that she "[j]ust got out of tub" and she "used [her] brush," he requests videos, "Yea????  Can Daddy see?" and "Mmmm yea?  Did u make any videos?"  She complies a little over a minute later by sending him the hairbrush video.[24]  Importantly, she also explicitly states that the video was made for Orlandella. Similarly, less than ten minutes after Orlandella told Minor A to "[h]elp [him] cum" and requested "nudes" from her, she sent him the digit picture.  Just minutes later, Orlandella urged Minor A to "[m]ake daddy a video of that tight teen cunt," and she complied moments after with the digit video.  As such, by the chronology and substance of the messages alone, a reasonable jury could have concluded that Minor A produced the hairbrush video, digit picture, and digit video in response to Orlandella's requests, entreaties, and pleas.

---

[24] Orlandella makes a passing argument that the hairbrush video could not have been produced in response to his requests because Minor A notes that she had just gotten out of the bathtub, so the video was necessarily made before Orlandella made such a request.  He seems to be conveniently forgetting, however, that he also requested bath-related content before she sent those messages.

Orlandella resists this conclusion with the two primary arguments we referenced above, to wit, that someone else prodded Minor A to send the sexually explicit materials, and/or that Minor A produced the videos and picture of her own free will. Starting with argument one, Orlandella counters that there was insufficient evidence he (as opposed to someone else) persuaded Minor A into producing the hairbrush video, digit picture, and digit video, because there was evidence in the record -- the argument goes -- that Minor A did not produce those videos and picture in response to his requests. This argument is essentially several interrelated arguments, and they go a little like this: (1) the hairbrush video, digit picture, and digit video did not show the female's face so the jury was required to infer it was Minor A, suggesting she might not actually be the female depicted therein; (2) there was no metadata[25] attached to the hairbrush video, digit picture, or digit video revealing when they were created, suggesting that they might have been created prior to any of Orlandella's requests to Minor A; (3) the hairbrush video tracks the description of the

_____

[25] Again, for those less technologically in-the-know, metadata is "embedded data about data that describes the history, tracking, or management of an electronic document." United States v. Murray, No. 3:18-cr-30018-MGM-1, 2019 WL 1993785, at *7 (D. Mass. May 6, 2019) (cleaned up).

videos found on Minor B's cellphone,[26] suggesting that the hairbrush video might depict Minor B and have been created by her as well; (4) the metadata attached to the videos and picture found on Minor B's cellphone revealed they were created before Orlandella requested any videos or pictures from Minor A, suggesting that the hairbrush video he received was not made at his request; and (5) the digit picture and digit video track the requests of SirGabe to Minor A,[27] suggesting that, if Minor A did make the picture and video, she made them at SirGabe's request, not at Orlandella's.

Basically, Orlandella is making a claim of innocence, arguing that the government failed to sufficiently prove that the female depicted in the hairbrush video, digit picture, and digit video is Minor A and that the videos and picture were created at his request, as opposed to at SirGabe's or some other person's request. But as we've said over and over again, "we do not 'demand that the government disprove every hypothesis consistent with the defendant's innocence.'" United States v. Apicelli, 839 F.3d 75, 80 (1st Cir. 2016) (quoting United States v. Spinney, 65 F.3d 231, 234 (1st Cir. 1995)). To the contrary, "[w]hen this [c]ourt reviews a jury verdict for sufficiency of evidence, it matters not

---

[26] Recall there were videos on Minor B's cellphone depicting a female inserting the handle of a hairbrush into her rectum and mouth.

[27] Recall SirGabe told Minor A, "'Now spread them and let me see what I want,' and he t[old] her to play with herself."

whether the defendant can raise a plausible theory of innocence: if the record as a whole justifies a judgment of conviction, it need not rule out other hypotheses more congenial to a finding of innocence." Id. (cleaned up). In other words, all that matters is that the record justifies the conviction. And here, as we showed above, the record does just that.

Moreover, even taking some of these arguments (which were all presented to the jury by Orlandella and rejected) head on, they don't really move the sufficiency-of-the-evidence needle for us. For example, Orlandella contends (confusingly so) that the jury would have been required to infer that the female in the hairbrush video, digit picture, and digit video was Minor A because the female's face was not visible. But that was a reasonable inference to make where the female in the bathtub picture was identified at trial by her mother as Minor A, the bathroom in the bathtub picture was identified at trial by Minor A's mother as the bathroom of the motel Minor A's family was staying at that weekend, the bathtub picture was sent mere minutes after the hairbrush video (which was also taken in a white bathtub), the digit picture and digit video were also taken in a bathroom, ID'ed by Minor A's mother as the motel bathroom, and Minor B was not at the motel with the rest of the family that weekend.

Orlandella also contends that there were similarities between the descriptions of the videos on Minor B's cellphone and

the content of the hairbrush video from Minor A's cellphone. But there were also important differences between them; the videos on Minor B's cellphone were described as involving the insertion of a hairbrush into a female's rectum and mouth, whereas the female in the hairbrush video is seen inserting the hairbrush into her vagina.[28] Along similar lines, Orlandella also contends that Minor A produced the digit picture and digit video at SirGabe's requests, because the content depicted therein track the content of SirGabe's requests to Minor A. But the jury could have reasonably disregarded this theory where the hairbrush video, digit picture, and digit video also track the content of Orlandella's requests to Minor A and where she explicitly said she made them for him.[29]

Moving on to Orlandella's second sufficiency argument, it likewise leaves a wee bit to be desired. In essence, he counters that there was insufficient evidence he persuaded Minor A into

_____

[28] Orlandella made much in his briefing and at oral argument of the fact that TFO DeMello testified that the hairbrush video and the videos found on Minor B's cellphone were the "same" and "consistent." But that wasn't the end of TFO DeMello's testimony on the topic. He later clarified that these videos "were not [the same]" and simply referred to them as consistent because they all involved the insertion of the handle of a hairbrush into a bodily orifice.

[29] It was also reasonable for the jury to conclude that Minor A produced the hairbrush video, digit picture, and digit video at Orlandella's requests, where the record has several other examples of her complying with his demands. To offer but one, when Orlandella told Minor A to "[m]ake a video of [her] sucking [her] fingers," she complied less than a minute later by sending him the thumb video. And after he complained that "the video was black," Minor A resent an easier-to-see thumb video.

- 35 -

producing the hairbrush video, digit picture, and digit video because she was "acting voluntarily . . . on a highly inappropriate lark, as adolescents are prone to do" and she "was more than willing to engage in 'sexually explicit conduct.'" By all this he means that no persuasion on his part was necessary because Minor A would have produced and sent the videos and picture anyway. This counterargument is yet another theory of innocence that the government was not required to disprove. See Spinney, 65 F.3d at 234. Regardless, this theory is belied by the record. At several points throughout their conversations, Minor A voiced her hesitance at sending videos or pictures of her engaging in sexually explicit conduct. When Orlandella first asked her for bath-related videos or pictures, she said, "Maybe." When he asked for videos at another point, she replied, "Idk" (shorthand for "I don't know"). Minor A also repeatedly had to ask Orlandella "[w]hat . . . [he] want[ed] [her] to do" and "[h]ow [to make him cum]" because "[she] need[ed] help." A reasonable jury, therefore, could have concluded that he persuaded Minor A through his repeated requests, entreaties, and pleas and by sending several videos and pictures of himself (including of him masturbating). See United States v. Streett, 83 F.4th 842, 854 n.10 (10th Cir. 2023) ("This is not to say that repeated requests cannot constitute persuasion. Wearing a minor down by repeatedly asking for a sexually explicit photograph may very well overcome the resistance of the minor.")

- 36 -

Having rejected both of Orlandella's counterarguments, we conclude a reasonable jury could have found beyond a reasonable doubt that he committed the crime of sexual exploitation of a minor.

And we reach that same conclusion as to the offense of attempt. To attempt to commit the crime of sexual exploitation of a minor, the government needed to prove beyond a reasonable doubt that Orlandella took a "substantial step" (i.e., more than "mere talk or hot air") towards the completion of the crime. Cf. United States v. Berk, 652 F.3d 132, 140 (1st Cir. 2011) (discussing an attempted violation of another statute, 18 U.S.C. § 2422) (citations and internal quotations marks omitted). Orlandella argues that a reasonable jury could not have found he took a "substantial step" towards the completion of the crime because Minor A acted voluntarily and, "[a]lthough . . . Orlandella ask[ed] [Minor A] to send him images, there [was] no element of coercion, pressuring or manipulation." This argument, identical to the one he makes for completion of the Count One offense, fails for the same reasons just discussed. A reasonable jury could have concluded that Orlandella took a substantial step towards the completion of the crime and "pressur[ed]" Minor A into producing sexually explicit conduct where she voiced her hesitance and he begged for videos and pictures repeatedly over the span of several days.

- 37 -

To sum up, the evidence was sufficient for a rational jury to convict Orlandella on Count One, under either a completed-crime theory or an attempt theory.[30]

## 2. Unanimity Instruction

As part of its jury instructions, the district court stated, "[Y]ou should engage in rational discussion of the evidence by all jurors for the purpose of reaching a unanimous verdict, a verdict that all of you agree on" and "As I said, your verdict must be unanimous on each count." This general unanimity instruction is the basis of Orlandella's second complaint, arguing that he is entitled to a new trial because the district court was required to give a more specific unanimity instruction as to Count One. As he sees it, first, because Count One of the indictment charged him with both the completed crime and the attempt, Orlandella argues the district court should have instructed the jury it had to agree unanimously on either a completed-crime theory or an attempt theory. Second, because each video or picture is a separate violation of 18 U.S.C. § 2251(a), Orlandella argues that the district court should have instructed the jury it had to agree unanimously on which specific videos or pictures contained

_____

[30] Before moving on, we note that Orlandella included an argument that should we find an undefined statutory term in 18 U.S.C. § 2251(a) to be ambiguous, the rule of lenity requires that we resolve such ambiguity in his favor. We didn't find any term to be ambiguous so his argument is irrelevant to our analysis.

sexually explicit conduct he persuaded Minor A to perform. We give these unanimity arguments a thumbs down for a few reasons, which we'll get into after a short standard-of-review-related pause.

## A. Standard of Review

Under normal circumstances, we review de novo a party's right to a jury instruction on unanimity because their right to such an instruction is a question of law. United States v. Newell, 658 F.3d 1, 20 (1st Cir. 2011). Here, though, we can chuck that de-novo default out the window, because Orlandella concedes he never objected to the district court's general unanimity instruction and, thus, failed to raise the issue below. See id. That means our review of the issue would be for plain error (at best). See, e.g., Jones v. United States, 527 U.S. 373, 388 (1999) ("While Rule 30 could be read literally to bar any review of petitioner's claim of error, our decisions instead have held that an appellate court may conduct a limited review for plain error."); Fed. R. Crim. P. 30(d) (directing that a failure to object -- whether to portions of the jury instructions or the district court's failure to issue a requested instruction -- generally "precludes appellate review, except as permitted under Rule 52(b)"). And that's not great for him because, as we've explained elsewhere, the standard for plain error review "is quite formidable." United States v. McCullock, 991 F.3d 313, 317 (1st

Cir. 2021).  A quick peek at the elements for plain-error review explains why:  Orlandella "must show not just (1) error, but (2) error that is clear, that (3) affected his substantial rights, and that (4) also seriously undermined the fairness, integrity, or public perception of his trial."  United States v. Takesian, 945 F.3d 553, 563 (1st Cir. 2019).

## B.  Analysis

Circling back to Orlandella's arguments and to repeat, he contends that the district court's general unanimity instruction amounted to two distinct errors, with either one being sufficient reason for us to order a new trial.  First, because Count One of the indictment charged him with both the completed crime and the attempt, Orlandella argues the district court should have instructed the jury it had to agree unanimously on either a completed-crime theory or an attempt theory.  Second, because each video or picture is a separate violation of 18 U.S.C. § 2251(a), Orlandella argues that the district court should have instructed the jury it had to agree unanimously on which specific videos or pictures contained sexually explicit conduct he persuaded Minor A to perform.  With our reviewing-for-plain-error glasses on, we, however, conclude that both arguments fail to clear plain error's formidable hurdles.

Orlandella's first argument stems from a proposition we can all agree on:  "when an indictment charges two or more distinct

offenses in a single count, it is duplicitous, and thus raises the prospect of a jury finding the defendant guilty on that count without being unanimous as to which of the two crimes set forth in that count the defendant committed."  United States v. Santiago, 62 F.4th 639, 645 (1st Cir. 2023).  He then takes this proposition and runs with it in the following way.

In his view, his indictment is duplicitous because Count One charged him with both the completed crime and attempt of sexual exploitation of a minor, which to him are two different crimes. To make his two-different-crimes point, he notes that the completed crime and attempt have two different mens rea[31] requirements:  to convict on the former, the government need not prove the defendant was aware the minor was underage,[32] whereas to convict on the latter, the government does need to make that showing.  So, to correct this duplicity (according to Orlandella at least), the district court was required to instruct the jury that it needed to be unanimous as to one of the government's theories of guilt (i.e., unanimous that he completed the crime or unanimous that he

---

[31] In non-Latin terms, mens rea simply refers to "the mental state -- 'knowingly' or 'willfully,' for example -- required to convict."  United States v. Morosco, 822 F.3d 1, 19 (1st Cir. 2016).

[32] Orlandella is indeed correct on this point, as we previously held that, to be found guilty of the completed crime of sexual exploitation of a minor, the defendant "does not . . . need[] to know the actual age of the minor victim."  United States v. Henry, 827 F.3d 16, 23 (1st Cir. 2016).

attempted to). And the district court -- the argument goes -- erred by failing to do so, even though no one asked for such an instruction.

For argument's sake, let's assume (without deciding) that Orlandella is right and the district court erred by failing to sua sponte give a more specific unanimity instruction. But as we're here on plain error, his burden doesn't end there; he must still demonstrate that this error was "glaringly" plain,[33] affected his substantial rights, and "seriously imperil[ed] the judiciary's public reputation." McCullock, 991 F.3d at 317. And this is where we find Orlandella's argument to be lacking.

With plain error's requirement in mind, we leapfrog straight to the adverse-effect-on-his-substantial-rights prong, with the knowledge that if Orlandella fails on any of the four prongs, his argument fails. See United States v. Velázquez-Aponte, 940 F.3d 785, 800 (1st Cir. 2019) (concluding argument failed where

---

[33] Orlandella doesn't point to any case of ours where we have held that, to be guilty of attempting sexual exploitation of a minor, the defendant needs to be aware of the minor victim's age. Accordingly, if there was an error, it was not plain. Notwithstanding the lack of on-point precedent in our circuit, our own research shows at least one court (one of our sister circuits) has concluded, in the context of attempting sexual exploitation of a minor, that "an attempt requires that the defendant believe that the intended performer is a minor." United States v. Johnson, 376 F.3d 689, 693 (7th Cir. 2004). But even then, favorable sister-circuit precedent is insufficient for plain error because "those circuits do not control our law." United States v. Grullon, 996 F.3d 21, 32 (1st Cir. 2021).

- 42 -

defendant did "not put forth any fact or argument that would" satisfy the third prong of plain error review). This prong "typically" requires that the error have "influenced the proceeding's outcome." McCullock, 991 F.3d at 317. He seems to argue that the district court's supposed error affected the outcome because some jurors could have found him guilty of the completed crime and others of the attempt, irrespective of his knowledge regarding Minor A's age. He elaborates that a jury could have found he didn't know Minor A's age because Kik is a legal, adult-oriented site not dedicated to child pornography. And because they were both members of a group called "Littles and Doms," it was reasonable for Orlandella to believe Kik-users in the group were "adults role-playing a particular fantasy," so when Minor A told him she was fourteen, it was reasonable for him to assume she was lying and was actually older than she claimed to be.

Color us unpersuaded. We cannot find that the district court's supposed error influenced the proceedings because the evidence regarding Orlandella's knowledge of Minor A's age is overwhelming. Not only did Minor A tell him she was a minor, but he acknowledged the age difference himself when he responded, "Ubsur ur ok with my age? I'm like WAY older." Throughout their conversations (which spanned several days), he indirectly acknowledged Minor A's age by constantly referring to her as a "bad girl," "babygirl," "good girl," "lil teen slut," and "lil

- 43 -

princess." When asking for a video of Minor A's vagina, he referred to it as a "tight teen cunt." Minor A also indirectly referenced her age when she mentioned that she had been at "[s]chool and gro[u]nded" and discussed her upcoming "track meet." What's more, Orlandella received pictures from Minor A showing her face, which reasonably demonstrate that she was a minor or were, at the bare minimum, a neon sign that she was a minor. See United States v. Soler-Montalvo, 44 F.4th 1, 9 (1st Cir. 2022) ("What's more, Janis sent two fake photographs of herself, and those photos were quite clearly of an underage girl."). In spite of Orlandella's protestations that Minor A's presence on an adult-oriented website caused him to reasonably believe he was playing fantasy-footsie with an adult, the jury was not required to accept his role-play version of events given the competing evidence suggesting otherwise. Simply put, we cannot say that the district court's general unanimity instruction affected the proceeding's outcome or impacted Orlandella's substantial rights.[34]

---

[34] Not that more is needed, but for these same reasons we can't say the alleged error affected the fairness, integrity, or public reputation of the judicial proceedings. Indeed, we have previously concluded that where "the evidence [regarding] the element [in question] . . . [was] nevertheless overwhelming and essentially uncontroverted, . . . there [is] no basis for concluding that the error seriously affected the fairness, integrity or public reputation of judicial proceedings." United States v. Lara, 970 F.3d 68, 88 (1st Cir. 2020) (fourth alteration in original) (citation and internal quotation marks omitted).

Not to be outdone, Orlandella's arguments on the general unanimity instruction don't end there. As we mentioned just some pages ago, he also argues that the district court's general unanimity instruction was an error because unanimity was also required as to which specific video or picture contained sexually explicit conduct he persuaded Minor A to perform. While it is true "that the proper unit of prosecution of [18 U.S.C. §] 2251(a) is each video depicting the victim," United States v. Smith, 919 F.3d 1, 5 (1st Cir. 2019), our plain error review is yet again the death knell for Orlandella's argument.

As before, we leapfrog straight to plain error's final two prongs. It is unclear to us as to how this alleged error affected his substantial rights or imperiled the judiciary's public reputation. Orlandella seems to suggest the lack of a unanimity-on-the-image-relied-upon instruction rendered the trial unfair for the same reasons underpinning his sufficiency-of-the-evidence challenge -- namely, that the female in the hairbrush video, digit picture, and digit video could not be identified from the images themselves as Minor A and that those videos and picture track SirGabe's requests to Minor A and track the descriptions of the videos found on Minor B's cellphone. Where we have already rejected these same arguments for the reasons we expressed in detail above, concluded that the hairbrush video, digit picture, and digit video were all lascivious, and determined that there was

sufficient evidence for a reasonable jury to find beyond a reasonable doubt that Orlandella persuaded Minor A to produce each of them, we cannot say that the lack of a unanimity-on-the-image-relied-upon instruction either affected the outcome below or left the proceedings or the judiciary's reputation in disrepute.

To wrap this whole instructional-error argument up, where Orlandella has not satisfied the prongs of plain error review, neither the lack of a specific completed-crime-versus-attempt instruction nor the lack of a specific unanimity-on-the-image-relied-upon instruction requires that we reverse his convictions or order a new trial.

### 3. Disclosure Violation

It is Criminal Law 101 that the government is required to disclose to the defense evidence that is both favorable and material either to guilt or innocence, which includes evidence that is exculpatory and impeaching. This obligation comes from the Supreme Court's decision in Brady v. Maryland, 373 U.S. 83 (1963), and it is this obligation that Orlandella turns to for his third complaint. Essentially, he argues that the government violated Brady by failing to turn over (1) the messages between Minor A and SirGabe and (2) the videos and picture found on Minor B's cellphone. We press pause on our assessment of this argument for an extended standard-of-review-related commercial break, but

(to not bury the lede) this argument fails for the reasons we explain in due course.

## A. Standard of Review

Preserved Brady claims are reviewed for abuse of discretion, see United States v. Raymundí-Hernández, 984 F.3d 127, 159 (1st Cir. 2020), whereas unpreserved Brady claims are reviewed for plain error, see United States v. Hodge-Balwing, 952 F.2d 607, 610 (1st Cir. 1991). And whether Orlandella preserved his Brady claims is a sticking point between the parties, with him naturally arguing that he did preserve them and the government arguing the opposite. To resolve this kerfuffle, we take a gander at what Orlandella did (or better yet, what he failed to do) below, conscious of the fact that "[t]o preserve a claim of error, a party must object to the district court's action in a timeous manner and inform the court of the 'grounds for that objection.'" United States v. Franklin, 51 F.4th 391, 400 (1st Cir. 2022) (quoting Fed. R. Crim. P. 51(b)).

Rewinding back to mid-2019, the SirGabe Brady issue first bubbled up in one of Orlandella's discovery motions, through which he sought to compel the government to produce (among other things) "[a]ll documents, reports, and objects regarding the investigation performed by 'the PD' in Texas concerning the investigation of any other 'male adult users' who interacted in any way with 'Minor A' during the course of the investigation."

- 47 -

After the government filed its opposition, the magistrate judge denied the motion with one exception not relevant to this issue. Even though Federal Rule of Criminal Procedure 59(a) gave him the opportunity to do so, Orlandella did not object to or seek review of the magistrate judge's decision. Fed. R. Crim. P. 59(a) ("A party may serve and file objections to the order within 14 days after being served with a copy of a written order or after the oral order is stated on the record, or at some other time the court sets. The district judge must consider timely objections and modify or set aside any part of the order that is contrary to law or clearly erroneous. Failure to object in accordance with this rule waives a party's right to review.").

Fast-forwarding to April 2022, this same issue bubbled up again on the third day of trial. During the cross-examination of Sergeant Griffith, Orlandella's lawyer asked her whether she had located communications between Minor A and two Kik users. The government was quick to object. At a sidebar conference, Orlandella's lawyer explained that, based upon Sergeant Griffith's May 22, 2018 report, she found evidence that Minor A had been communicating with two other adult male Kik users, but that one of their names had been redacted. He also argued that this information was relevant to "whether or not some of the photographs that are attributed to Mr. Orlandella actually were sent to a second individual." The district court decided to excuse the jury

and allow Orlandella's lawyer to voir dire Sergeant Griffith on the topic. During voir dire, she testified that she had located messages between Minor A and two Kik users, gianninyny and SirGabe. She also testified that the messages between Minor A and SirGabe included at least one video, the contents of which she could not remember.

After Orlandella's lawyer finished questioning Sergeant Griffith, the district court commented, "And the fact that [Minor A] was sending images to more than one person I think may have been something that [Orlandella] was entitled to under Brady and Rule 16[35] and entitled to far enough in advance to conduct an investigation." Nevertheless, the district court explained that any evidence regarding the messages between Minor A and SirGabe was "cumulative" because "the jury ha[d] already heard that she was texting more than one male and heard it from her mother and heard it from [Officer Thompson]." Significantly, the district court noted that neither party was requesting a continuance to pursue an investigation into this issue. In the end, the district court decided to allow the jury to hear evidence about Minor A's communications with other Kik users because it was relevant but also stated no Brady violation had occurred:

---

[35] In short, this rule requires the government to disclose to the defendant certain information before trial, such as oral and written statements, prior records, expert witnesses, documents, and objects. See generally Fed. R. Crim. P. 16.

And I'll say the following since I raised the issue of whether this should have been disclosed earlier. In order for there to be a Brady violation, due process violation, any exculpatory evidence has to be material. And I don't know how the case is going to come out, although I can make an informed prediction, but we have to see how it comes out. But to me, there's extremely strong evidence that Mr. Orlandella is the person who caused her to stick the hairbrush into her vagina and send him the picture. It flows. It's part of the continuing conversation.

So I think if he's convicted, the fact that he didn't -- the defendant knew there was somebody else. The defendant could have come to me and asked me to order that the name not be redacted. But I don't see that the defendant -- at the moment, I don't see the defendant is prejudiced by not having known this earlier, and I'm going to let the evidence in, and, you know, we'll see what the jury does.

There was not even a peep from Orlandella in response to the district court's remarks, neither in the form of an objection (of some sort), a request for a continuance (or for that matter, a mistrial), nor an explanation as to why the district court's Brady violation ruling was incorrect.

Then, with Sergeant Griffith back on the stand for regular questioning, Orlandella's lawyer continued his cross-examination. Sergeant Griffith testified, as she did in voir dire, that she located communications between Minor A and SirGabe, including a video, the contents of which she could not recall. Because she could not recall the contents, the jury was then read

the following part of her May 22, 2018 report, at Orlandella's lawyer's insistence:

> In [Minor A's] communication with SirGabe, [Minor A] sends nude videos and photos to him. He sends her videos but none are nude. In some of his messages SirGabe tells [Minor A], "Now spread them and let me see what I want," and he tells her to play with herself.

Orlandella's lawyer then quickly moved on to another line of questioning, again without a peep related to any potential Brady violation on the SirGabe front.

Changing topics to the Minor B Brady issue (i.e., issues relevant to the sister's seized cellphone), TFO DeMello testified during cross-examination that he had located the following on her cellphone: (1) "a 23-second-long video consisting of what appears to be a naked female minor inserting and removing the handle of her hairbrush from her rectum," created on May 16, 2018; (2) "a still image of the naked female minor with a hair brush protruding from her rectum," created on May 16, 2018; (3) "a 38-second video of a naked female minor with a pink pacifier in her mouth rubbing her naked breasts," created on May 17, 2018; and (4) "a 31-second video of a naked female minor inserting and removing the handle of a hairbrush from her mouth," created on May 18, 2018. Neither at that point nor at any other point throughout the trial did Orlandella's lawyer raise a Brady violation regarding disclosure of the videos and picture found on Minor B's cellphone.

So, to lay it all out, with respect to the alleged SirGabe Brady violation, Orlandella had several opportunities to "object to the district court's action in a timeous manner and inform the court of the 'grounds for that objection,'" Franklin, 51 F.4th at 400 (quoting Fed. R. Crim. P. 51(b)), yet failed to do so at every turn. With respect to the purported Minor B Brady violation, Orlandella never even uttered the word "Brady" to the district court relative to any failed disclosures. Despite all that self-inflicted, procedural dereliction working against him, he suggests in a one-sentence footnote with no citation to our caselaw (or to that of any other court) that the Brady issues were properly preserved because "the district judge addressed the issue at trial."

That unobstreperous argument falls short on several fronts. Setting aside any appellate waiver problems for failure to properly develop this argument,[36] as an initial matter, while the district court addressed the SirGabe Brady issue of its own accord (and without any prompting on Orlandella's part), the district court never addressed (nor was it asked to address) any

---

[36] As we're known to repeat until we're blue in the face, "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived" and "[i]t is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones." United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).

Brady violation as it pertains to the videos and picture found on Minor B's cellphone. There is, accordingly, no argument to be made that the Minor B Brady issue was preserved. As for the SirGabe Brady issue, it is true that the district court addressed it but it never had the opportunity to address Orlandella's debuting-for-the-first-time-on-appeal objections to that issue (specifically, as argued here, that any information regarding adult males interacting with Minor A should have been disclosed because it was material and the failure to produce said information prejudiced the defense). The district court, accordingly, never got an opportunity to consider whether there was any merit to Orlandella's objections (as he presses them here) or whether it reached the right decision. This is exactly the type of "'sandbagging' [of] the court -- that is, 'remaining silent about his objection and belatedly raising the error only if the case does not conclude in his favor'" -- that our rule requiring parties to object in a timely fashion is designed to prevent. Id. (quoting Puckett v. United States, 556 U.S. 129, 134 (2009)). We have not "permit[ted] such hedging of arguments" before and have no plans to do so here either because to do so "would undercut the principle that the district court -- which 'is ordinarily in the best position to determine the relevant facts and adjudicate the dispute' -- should be afforded an opportunity to consider and

- 53 -

resolve the parties' objections." Id. (quoting Puckett, 556 U.S. at 134).

Orlandella is, therefore, left saddled with plain error review for his Brady claims.

**B.  Analysis**

Turning back to the merits of Orlandella's Brady claims, we don our reviewing-for-plain-error glasses again but we need not keep them on for long.  That is because he never addressed the plain-error standard in his brief or how his Brady claims can meet that standard.  For that reason, Orlandella's Brady claims were unpreserved below and are waived on appeal.  See, e.g., United States v. Pabon, 819 F.3d 26, 33 (1st Cir. 2016) ("Pabon has waived these challenges because he has not even attempted to meet his four-part burden for forfeited claims[.]"); United States v. Vásquez-Rosario, 45 F.4th 565, 571 (1st Cir. 2022) (deeming claim waived where appellant did not address the applicable standard of review); United States v. Bulger, 816 F.3d 137, 157 (1st Cir. 2016) ("Whether you characterize Bulger's Brady claim as unpreserved because he did not seek a ruling below, or waived for failure to adequately develop it on appeal, his claim fails.").  And we've routinely declined to address an unpreserved and waived Brady claim for the first time on appeal.  See, e.g., Bulger, 816 F.3d at 157; United States v. Singleterry, No. 98-2038, 1999 WL 529454, at *2 (1st Cir. Mar. 17, 1999).

Even were we to give him a pass on these game-ending errors, Orlandella's Brady claims would still fail on the merits. A successful Brady claim requires that the alleged suppressed evidence be "'material,' meaning that 'its suppression undermines confidence in the outcome of the trial.'" Raymundí-Hernández, 984 F.3d at 159 (quoting United States v. Bagley, 473 U.S. 667, 678 (1985)). To do so, a three-part showing is required: "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the [government], either willfully or inadvertently; and prejudice must have ensued." Strickler v. Greene, 527 U.S. 263, 281-82 (1999). And in this context, "the prejudice element . . . considers whether in the absence of the suppressed evidence, the defendant 'received a fair trial, understood as a trial resulting in a verdict worthy of confidence.'" Raymundí-Hernández, 984 F.3d at 160 (quoting Kyles v. Whitley, 514 U.S. 419, 434 (1995)). But we have also made clear that "there is no Brady violation compelling a new trial when the belatedly supplied evidence is merely cumulative or impeaching on a collateral issue." United States v. Martínez-Mercado, 919 F.3d 91, 105 (1st Cir. 2019).

Here, the allegedly suppressed evidence (the messages between Minor A and SirGabe and the videos and picture found on Minor B's cellphone) were not material because they were

- 55 -

cumulative. To explain, the jury heard from Officer Thompson and Minor A's mother that Minor A had been messaging multiple older men. The jury also heard Sergeant Griffith's testimony that she had found messages between Minor A and SirGabe, including a video. The jury was then read a portion of Sergeant Griffith's report, which stated that Minor A "sen[t] nude videos and photos to [SirGabe]." Later on, the jury also heard testimony from TFO DeMello describing the contents of the videos and picture found on Minor B's cellphone. And Orlandella's lawyer emphasized both issues in his closing argument. Where the jury was already presented with the same evidence and arguments (and presumably rejected them), we cannot say that the messages themselves were material such that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Bagley, 473 U.S. at 682.

Therefore, whether we consider Orlandella's Brady claims unpreserved, waived, or lacking in merit, they fail on appeal.[37]

------

[37] Orlandella also argues that he was prejudiced by these Brady violations because, even though he was given some discovery during the trial (i.e., SirGabe's username and portions of Sergeant Griffith's May 22, 2018 report that were previously redacted), he did not have time to conduct a proper investigation. But as we previously noted, he never requested a continuance to conduct such an investigation so his claim of prejudice fails. See United States v. Sepulveda, 15 F.3d 1161, 1178 (1st Cir. 1993) ("As a general rule, a defendant who does not request a continuance will not be heard to complain on appeal that he suffered prejudice as a result of late-arriving discovery.").

### 4.  Missing Witness Instruction

Orlandella's fourth argument stems from the government's failure to call Minor A to testify at trial.  Orlandella believes that she could have filled in some of the holes he tried (and is currently trying) to poke in the government's case against him -- namely, "[s]he could have provided evidence as to when, why, and for whom the videos were created."  The fact that the government didn't call her (in Orlandella's mind) suggests her testimony would not have actually been favorable to the government and entitled him to a missing witness instruction, which he requested below.  The district court denied this request.  Orlandella believes this denial was a mistake and we should order a new trial because of it.  We don't think this missing-witness-instruction argument sticks the landing and we'll explain why after our shortest-yet standard-of-review-related break.

### A.  Standard of Review

The denial of a missing witness instruction is reviewed for abuse of discretion, United States v. Sandoval, 6 F.4th 63, 102 (1st Cir. 2021), and both parties (mercifully) agree on this standard of review.

### B.  Analysis

With our reviewing-for-abuse-of-discretion glasses on, we note that Orlandella would have only been entitled to a missing witness instruction if he demonstrated that Minor A was "(1)

favorably disposed to testify for the government by virtue of [her] status or relationship with the parties, or (2) peculiarly available to the government, such as being within the government's exclusive control." United States v. DeLuca, 137 F.3d 24, 38 (1st Cir. 1998) (citation and internal quotation marks omitted). Orlandella argues that both conditions were satisfied below and the district court abused its discretion rejecting his request for the missing witness instruction by committing several legal errors. He argues that the district court improperly rested its analysis on whether he could have subpoenaed Minor A to testify at trial and that the district court improperly analyzed Minor A's relationship with each party. To figure out whether Orlandella satisfied either requirement and whether the district court committed an abuse of discretion, we take a look at what happened below.

On the last day of trial, Orlandella's lawyer informed the district court that he wanted to argue in his closing argument that the government failed to call Minor A as a witness and requested a missing witness instruction. He explained that Minor A would have been "able to explain a lot of the things that are left unexplained and [the government] didn't call her."[38] For its

---

[38] We note that Orlandella was aware from before the trial ever began that the government would not be calling Minor A as a witness, because she was never included in the government's witness list.

part, the government explained that Orlandella's lawyer was free to argue Minor A's absence in his closing argument, but an explicit jury instruction to that effect was inappropriate because Orlandella's lawyer never showed that he could not have called Minor A as a witness himself or that her testimony would materially change the evidence upon which the government was relying. When the district court asked Orlandella's lawyer whether he could have subpoenaed Minor A, he responded, "Well, I could have, but we don't have the burden to put forth any evidence." After some more back-and-forth, the district court told Orlandella's lawyer that he could argue Minor A's absence in his closing argument and would reserve judgment on whether to give a missing witness instruction.

After the close of the government's evidence, the district court denied the request for a missing witness instruction and laid out its reasoning:

> Over the break I've considered whether to give the requested missing witness instruction, and I've decided that it's not necessary or appropriate. The proposed instruction pattern instruction 2.12 says, "If it is peculiarly within the power of the government to a produce a witness who could give material testimony or if a witness because of his or her relationship to the government would normally be expected to support the government's version of events, the failure to call that witness may justify an inference that his testimony or her testimony would, in this instance, be unfavorable to the government." And it goes on.

- 59 -

I find the prerequisites for giving the instruction are not met. And in reaching that conclusion, I have in mind, for example, Ramos-González, 775 F.3d 483 at 500, the first case cited by the First Circuit.

I find it is not peculiarly within the [government's] power to produce [Minor A], the minor involved in this case. The defendant could, under Rule 17, have subpoenaed [Minor A] and compelled her testimony even though I infer that her mother would not have allowed her to be interviewed by the defendant before trial.

I also find that [Minor A] would not normally be expected to support the government's version of events because of her relationship with the government. I have no evidence that she has any relationship with the government. I'm not aware that any of the prosecutors have interviewed her or any of the federal agents have interviewed her.

She did have a relationship with the defendant. She called him daddy. She might be unhappy that he got in trouble because of their relationship and communications.

The government does have a relationship with [Minor A's] mother, but I think anybody who's had a teenager knows that teenagers don't always do what their mothers and fathers want them to do and there's compelling evidence that she made those videos. That's something her mother didn't want her to do.

So I'm not going to give the instruction, and I believe it's at least within my discretion not to, but as we said earlier, you can argue the fact that she wasn't called, Mr. Cipoletta.

Having reviewed the record, we conclude that there was no abuse of discretion.

- 60 -

To begin (as the district court did) with whether Minor A was "peculiarly available" to the government, nothing in the record suggests that Orlandella could not have subpoenaed her if he so chose. Indeed, Orlandella's lawyer noted himself that he could have subpoenaed Minor A. And the district court was not unreasonable to have relied on Orlandella's ability to subpoena her in concluding she was not peculiarly available to the government, where we have routinely relied on that same factor. See, e.g., Sandoval, 6 F.4th at 103 ("The defendants seem to acknowledge that CW-1 was not physically unavailable given that the government was willing to produce him for trial."); United States v. Anderson, 452 F.3d 66, 82 (1st Cir. 2006) ("Moreover, Anderson had the same ability as the government to seek a subpoena to require Besore's appearance at trial. Anderson clearly knew Besore might be a witness and indeed had reason to believe he might be important to his defense. As the defense conceded, however, it never tried to subpoena Besore."); United States v. Pagán-Santini, 451 F.3d 258, 267 (1st Cir. 2006) ("There is no indication that Pagán even attempted to call Ornelas to testify, further undermining the requested instruction."); DeLuca, 137 F.3d at 38 ("Finally, and most importantly, appellants made no attempt to call either Calenda or Buehne at trial.").[39]

_____

[39] Even though it is true, as Orlandella's lawyer noted below, that Orlandella had no burden to call any witnesses or present any

Orlandella suggests that relying upon his ability to subpoena Minor A in determining whether she was peculiarly available to the government was an error of law. To support this argument, he cites our decision in United States v. Johnson, 467 F.2d 804, 809 (1st Cir. 1972), where we held that "[a] witness's availability is not to be decided on the basis of his physical presence in the court room or his accessibility by writ of habeas corpus or by subpoena," but "rather that a witness's practical and legal availability is to be determined on the basis of his disposition and relationship toward the parties." But we long ago recognized that "our statement in Johnson regarding 'disposition' of the witness may appear to be in conflict with language in subsequent opinions suggesting that a witness'[s] 'availability' is solely determined by the feasibility of obtaining his testimony at trial." United States v. Ariza-Ibarra, 651 F.2d 2, 15 (1st Cir. 1981). Having noted this apparent conflict, we concluded that "[t]ypically, what is referred to as an 'absent witness' or 'missing witness' instruction deals only with 'control', not with 'predisposition.'" Id. at 16 (E. Devitt & C. Blackmar, Federal Jury Practice and Instructions § 17.19 (3d ed. 1977)). And so, as our post-Johnson caselaw makes clear, a party's ability to subpoena

_____

evidence, the fact of the matter -- and what matters for our analysis here -- is that he still had the ability to subpoena Minor A if he had chosen to do so.

the missing witness is important to their entitlement to a missing witness instruction. See, e.g., United States v. Ramos-González, 775 F.3d 483, 500 (1st Cir. 2015) ("Nothing in the record suggests that Ramos lacked access to Vélez or was unable to call her as a witness."); Adelson v. Hananel, 652 F.3d 75, 87 (1st Cir. 2011) (similar); United States v. Márquez-Figueroa, 187 F. App'x 18, 20 (1st Cir. 2006) (similar). Applying that caselaw here, with no evidence that only the government could obtain Minor A's appearance at trial, the instruction was not required.

Regardless, the district court did consider Minor A's disposition and relationship with the parties. In assessing whether Minor A was "favorably disposed" to testify in favor of the government, the district court explained that there was no evidence Minor A had any relationship with the government and that it was unclear whether Minor A would have testified favorably for the government because she had a prior relationship with Orlandella. We discern no abuse of discretion in the district court's considerations or its explanation. For starters, the record before us does not support the contention that Minor A had a relationship with the government. The only substantive communication between Minor A and any individual involved in the investigation or prosecution was Sergeant Griffith's safety check, the details of which Orlandella did not seek when imploring the district court for a missing witness instruction. Besides that,

there's nothing from which we could even infer that Minor A played a role in the federal agents' or prosecutors' investigation and prosecution. There's also nothing in the record indicative of Minor A's disposition toward Orlandella, his prosecution, or the government's case against him. Without any such evidence or proffer in the record, we cannot say that the district court abused its discretion when it concluded that Minor A was not so clearly favorably disposed in favor of the government, due to her prior relationship with Orlandella. Ramos-González, 775 F.3d at 500 (upholding denial of missing witness instruction where it was "[l]ess clear . . . which side would have benefitted more from [the witness's] testimony"); Anderson, 452 F.3d at 81 (similar).

In response, Orlandella argues that the district court did commit an abuse of discretion because it "did not seriously address the actual relationship and accessibility between [Minor A] and the parties" and "[r]ather . . . focused its ground for refusal, based in the evidence, regarding [Minor A's] disposition in favor of Mr. Orlandella." He goes on to say that the district court "assumed that [Minor A] would have positive feelings towards Mr. Orlandella" and "that her testimony could likely have been favorable to [him]," and, in doing so, the district "court relied on the very inference the missing witness instruction allows the jury to draw as grounds for refusing to give the instruction." (italics omitted). This argument misses the mark because, as even

- 64 -

Orlandella acknowledges, in assessing whether the missing witness is "favorably disposed" toward one party, the district court necessarily has to take into account the relationship between the witness and both parties as it is reflected in the record before the court. Johnson, 467 F.2d at 809 ("We hold . . . that a witness's . . . availability is to be determined on the basis of his disposition and relationship toward the parties."). It was, accordingly, not an error for the district court to consider Minor A's disposition towards Orlandella and no abuse of discretion occurred.

Significantly, even if the denial of the missing witness instruction was an abuse of discretion (it wasn't), we have held that where a party had the opportunity to argue the witness's absence to the jury "significantly undercuts their claim that the denial of a missing witness instruction was detrimental to the defense." Sandoval, 6 F.4th at 104 (cleaned up and citation omitted); see also United States v. Perez, 299 F.3d 1, 5 (1st Cir. 2002); United States v. Martinez, 922 F.2d 914, 925 (1st Cir. 1991); Ariza-Ibarra, 651 F.2d at 16 n.22. Here, as Orlandella himself concedes, he had the opportunity to argue Minor A's absence to the jury and did so. Indeed, Orlandella's lawyer "hammered this point home [in his closing argument], the prosecutor did not object, and the court gave no curative instruction." Perez, 299

F.3d at 5. Therefore, any claim that Orlandella was prejudiced by the denied missing witness instruction is speculative at best.[40]

We needn't say more on this topic. The district court did not abuse its discretion in denying Orlandella a missing witness instruction and, in any event, there is no evidence to suggest the denial prejudiced him.

### 5. Motion to Suppress Statements

Lastly, we turn to the last arrow in Orlandella's quiver. For his fifth and final argument, he complains that the incriminating statements he made to SA Iannaccone and SA Kelleher were taken in violation of his Miranda rights and the district court was wrong to deny his motion to suppress.[41] To properly frame our analysis, we first take a beat to describe our last standard of review.

---

[40] Orlandella argues he was prejudiced by the denial of the missing witness instruction because the deficiencies in the government's evidence that he pointed to in his sufficiency-of-the-evidence challenge would have been more "glaring" to the jury, if they had "been properly instructed that they could draw inferences against the government from the failure to call [Minor A] as a witness." Our analysis above, however, has already shown that the government's evidence was more than sufficient for a reasonable jury to have concluded beyond a reasonable doubt that Orlandella either committed the sexual exploitation of a minor or attempted to do so.

[41] As we mentioned above, Orlandella also filed two other motions to suppress, seeking to suppress evidence found in his home and car. The district court also denied these motions and Orlandella does not contest those decisions on appeal, so that's our final mention of them.

- 66 -

## A.    Standard of Review

There are several layers to our review of a motion to suppress.  Questions of law get de novo review, whereas findings of fact get clear error review.  Carpentino, 948 F.3d at 21.  Within our clear error review of findings of fact, "we are bound to accept all reasonable inferences by the district court from those facts."  Id.  Significantly, arguments not made to the district court regarding suppression are waived absent a showing of good cause to excuse the failure.  United States v. Lindsey, 3 F.4th 32, 40-41 (1st Cir. 2021).

## B.    Analysis

With our standard of review squared away, we turn to whether Orlandella's Miranda rights were violated.

Miranda warnings are required "before a person is questioned by law enforcement officers after being taken into custody or otherwise deprived of his freedom of action in any significant way."  United States v. Simpkins, 978 F.3d 1, 9 (1st Cir. 2020) (cleaned up and citation omitted).  Without such warnings, a suspect's statements are usually inadmissible at trial.  See United States v. Conley, 156 F.3d 78, 82 (1st Cir. 1998).  "Once a suspect is advised of his Miranda rights, though, he may waive those rights and consent to an interrogation."  Carpentino, 948 F.3d at 20.  Such a waiver must be both "knowing and voluntary."  Id. at 26.  In this context, "knowing" means with

a "full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon," and "voluntary" means "the product of a free and deliberate choice rather than intimidation, coercion and deception." United States v. Sweeney, 887 F.3d 529, 536 (1st Cir. 2018) (citation and internal quotation marks omitted). In evaluating a Miranda waiver, the proper question is "whether the defendant's conduct, evaluated in light of all the attendant circumstances, evinced a knowing and voluntary waiver." Simpkins, 978 F.3d at 11.

The thrust of Orlandella's main argument is that SA Iannaccone and SA Kelleher did not adequately advise him of his Miranda rights, because he only had about thirteen seconds to both review the form informing him of his rights and to waive those rights. Consequently, he did not have sufficient time to cede his rights knowingly and voluntarily and the district court erred by concluding otherwise. The government, as might be expected, disagrees with Orlandella's take and argues that he had adequate time to review and digest the waiver and, accordingly, was properly advised of his rights. As such, the argument goes, the district

court did not err.[42]  This question,[43] however, is one we need not resolve because if we conclude, as we do, that any alleged Miranda violation was harmless beyond a reasonable doubt, there is no basis to disturb the district court's ruling or Orlandella's convictions.  United States v. Carl, 593 F.3d 115, 119 n.3 (1st Cir. 2010) ("Statements induced in violation of Miranda's safeguards are appropriate for analysis under the 'harmless beyond a reasonable doubt' test." (quoting United States v. Batista-Polanco, 927 F.2d 14, 21 (1st Cir. 1991))); see also United States v. Doe, 23 F.4th 146, 151 (1st Cir. 2022) (sidestepping the merits of an alleged Miranda violation where the violation was harmless beyond a reasonable doubt); United States v. Verdugo, 617 F.3d 565, 574 (1st Cir. 2010) (same); United States v. Kallevig, 534 F.2d 411, 415 (1st Cir. 1976) (same).  And this is the approach we'll take here, ever aware of the fact that "[t]he simplest way

---

[42] While the district court concluded that Orlandella only had the document for about thirteen seconds, it also concluded that he "looked at it carefully enough to see that the form stated on separate lines each of the Miranda rights with which he was familiar and included a statement that he was waiving those rights."  The district court reasoned Orlandella was more familiar than other defendants with Miranda because he studied criminal justice in college and had worked as a probation officer for twenty years.

[43] Of course, the parties would usually address the antecedent question first (i.e., whether Orlandella was in custody when he made the statements such that Miranda warnings would have been required), but here all the parties agree he was in custody.

to decide a case is often the best." Stor/Gard, Inc. v. Strathmore Ins. Co., 717 F.3d 242, 248 (1st Cir. 2013) (citation omitted).

A constitutional error, like a Miranda violation, is harmless beyond a reasonable doubt when there is no "reasonable possibility that the evidence complained of might have contributed to the conviction." United States v. Porter, 764 F.2d 1, 7 (1st Cir. 1985) (quoting Fahy v. Connecticut, 375 U.S. 85, 86-87 (1963)). In practical terms, however, "courts have found error to be harmless [beyond a reasonable doubt] when the untainted evidence, standing alone, provided 'overwhelming evidence' of the defendant's guilt." Clark v. Moran, 942 F.2d 24, 27 (1st Cir. 1991) (quoting Harrington v. California, 395 U.S. 250, 254 (1969)); see also Doe, 23 F.4th at 151 (alleged Miranda violation was harmless beyond a reasonable doubt because other evidence was "overwhelming"); Kallevig, 534 F.2d at 415 (same). To put it simply, "there must be 'no reasonable doubt' that the jury would have reached the same verdict without having received the tainted evidence." Clark, 942 F.2d at 27 (quoting Milton v. Wainwright, 407 U.S. 371, 377 (1972)); see also United States v. Coker, 433 F.3d 39, 47 (1st Cir. 2005) ("In other words, [in the context of an alleged Sixth Amendment violation,] the government would have to prove beyond a reasonable doubt that Coker would have been convicted even if his confession had not been admitted into evidence.").

Whether a constitutional error is harmless beyond a reasonable doubt is also a multi-factor analysis. For example, "[h]armlessness turns on things like the importance of the [statement] to the case, the cumulativeness of the [statement], the presence or absence of other evidence corroborating or contradicting the [statement], the extent of permitted cross-examination, and the overall strength of the government's case." United States v. George, 761 F.3d 42, 56 (1st Cir. 2014).

Against this legal backdrop, we readily conclude that any Miranda violation here was harmless beyond a reasonable doubt. But before we get into the nitty-gritty of our analysis, let's recall what Orlandella actually said during his interview with SA Kelleher and SA Iannaccone. He more or less admitted to the following: (1) he had previously used the Kik app; (2) it was possible that he might have used Kik to send and receive pictures; (3) he was the adult male wearing a camouflage cap depicted in gianninyny's profile picture; (4) he thought he remembered using the username gianninyny; (5) he could have taken one of the videos that SA Kelleher and SA Iannaccone showed him; and (6) some of the images sent from gianninyny to Minor A depicted his upstairs bathroom.

Each of these statements, accordingly, went to the issue of whether Orlandella was gianninyny, the individual communicating with pineapples1118. The evidence on this issue, though, was

overwhelming and pointed uniformly towards Orlandella. For example, the documents provided by Kik indicated that a Motorola Android XT1635 cellphone was used to register the gianninyny account, it was registered in the United States in the EST time zone, and two IP addresses were used to access that account, with one of those IP addresses being associated with a Comcast Cable Xfinity account. The documents provided by Comcast Cable, in turn, indicated that Orlandella was the subscriber for that specific IP address, with a service address to Orlandella's home address in Beverly, Massachusetts. In searching Orlandella's home, HSI agents found his two cellphones -- both (you guessed it) Motorola Android XT1635 cellphones. Forensic analyses of these cellphones revealed that Kik had previously existed on both devices. To make matters even worse for Orlandella, the forensic analysis of the newer cellphone also turned up the profile picture associated with the gianninyny account.

The evidence on this issue does not even end there. HSI agents discovered a blue bracelet with pink writing and a camouflage cap when they searched Orlandella's home and car. That blue bracelet is consistent with the blue bracelet that can be seen in various videos and pictures gianninyny sent to Minor A. That camouflage cap is consistent with the camouflage cap in gianninyny's profile picture and with the camouflage cap that can be seen in a video gianninyny sent to Minor A. And if more were

needed -- and we doubt it is -- several of the videos and pictures gianninyny sent to Minor A were taken in front of a bathroom mirror, with four globe lights above the mirror. The globe light at the far left, however, is missing. Orlandella's upstairs bathroom was consistent with the bathroom in the videos and pictures gianninyny sent to Minor A, with one striking similarity -- (again, you guessed it) the globe light at the far left was missing. In sum, Orlandella's statements were hardly "the sole evidence presented at trial linking" him to the gianninyny account. United States v. Downs-Moses, 329 F.3d 253, 268 (1st Cir. 2003) (alleged Miranda violation was harmless beyond a reasonable doubt where post-arrest statement was "insignificant in the context of the other evidence presented"). His statements were, therefore, unnecessary or cumulative at best. See Doe, 23 F.4th at 152 (concluding that alleged Miranda violation was harmless beyond a reasonable doubt, in part, because the allegedly improperly introduced evidence was cumulative of other evidence).[44]

That said, we do not mean to discount the powerful effect that a defendant's confession can have on a jury and their deliberations. To be sure, our own caselaw reflects as much. See, e.g., United States v. Leon-Delfis, 203 F.3d 103, 112 (1st Cir.

---

[44] Our conclusion is further supported by the fact that nowhere in his briefing does Orlandella even attempt to grapple with all this other evidence, of which his statements were cumulative.

2000) ("Confessions are by nature highly probative and likely to be at the center of a jury's attention."). But let's be clear: Orlandella's statements were not the "most complete and detailed confession" we have, at times, refused to overlook in the past. Roy v. Hall, 521 F.2d 120, 123 (1st Cir. 1975); but see Coker, 433 F.3d at 41, 47-49 (concluding, in an arson case, alleged Sixth Amendment violation was harmless beyond a reasonable doubt, despite jury having heard defendant's explicit confession to "setting fire to the High Rock Street apartment building," because remaining evidence was "so overwhelming"). They also were not the "clincher" in a case otherwise filled with "gaps in the identification evidence" and lacking "conclusive evidence . . . t[ying] petitioner tightly to the crime." Coppola v. Powell, 878 F.2d 1562, 1571 (1st Cir. 1989). Rather, contrary to Orlandella's protestations, his statements were equivocal and he waivered at every turn throughout the interview.

To put it all on the table, let's spell out some of Orlandella's hedges. Orlandella did state that he used Kik "a while, a long time ago," but also stated that he "d[idn't] remember" and was "not sure" when he used it last. While, at one point during the interview, he responded, "I think so" when asked if he remembered using the username gianninyny, he also, at other points in the interview, said he "d[idn't] remember" using that username and he was not familiar with it. Even though Orlandella

stated it was "possible" that he might have sent and received pictures over Kik, SA Iannaccone later asked him, "You mentioned that you may have taken you know videos and pictures or received them as well. Where. . . did you do that outside the house or inside the house?" and he responded, "When did I say that[?]" Orlandella stated that he used his cellphone exclusively, but then quickly clarified that, to the extent he was "aware of," no one else used his cellphone. Although he stated that the bathroom in one of the videos gianninyny sent to Minor A looked like his upstairs bathroom, he also stated that he "c[ouldn't] tell." Finally, Orlandella only stated that the man in gianninyny's profile picture "could be" him.

Accordingly, for each incriminating statement, there was an accompanying equivocation. His statements were a far cry from the airtight, unequivocal, and damning confession he now tries to characterize them as. In comparison to these statements, the aforementioned evidence was much more concrete and compelling, and proved everything that his statements might have corroborated.

Lastly, important to our analysis is the fact that Orlandella's statements did not clearly undermine many of his theories of defense both below and on appeal. His statements went to the issue of whether he was gianninyny, but his defenses turned on whether there was sufficient evidence that (1) he (as opposed to SirGabe or someone else) persuaded Minor A to produce the

- 75 -

hairbrush video, digit picture, and digit video containing sexually explicit conduct; (2) Minor A was acting of her own volition; and (3) the hairbrush video, digit picture, and digit video might actually depict Minor B. Indeed, Orlandella's lawyer emphasized all three points in his closing argument. Thus, Orlandella self-identifying as gianninyny "was entirely consistent with the defense theor[ies]." United States v. Orlando-Figueroa, 229 F.3d 33, 45 (1st Cir. 2000); see also United States v. Gines Mercado, No. 91-1217, 1991 U.S. App. LEXIS 21192, at *7 (1st Cir. Aug. 21, 1991) ("And in this instance, any error was, indeed, benign. At no time was the appellant's possession of, or knowledge anent, the heroin a contested issue at the trial. To the contrary, the appellant's sole defense -- personal use -- rested on the foundation that he was in fact carrying heroin.").

For all these reasons, we accordingly conclude any Miranda violation was harmless beyond a reasonable doubt because the remaining evidence was overwhelming and the jury would have reached the same verdict, even without Orlandella's statements.[45]

---

[45] Before we close, we note that Orlandella suggested in his briefing that, were we to conclude no Miranda violation occurred, the statements should nevertheless be suppressed because his custodial interrogation amounted to an unlawful arrest without probable cause in violation of the Fourth Amendment. He, however, never raised this argument in his pretrial motion to suppress, and did not address in his briefing to us any good cause he might have had for this oversight. Without such a good-cause showing, his claim is accordingly waived. See Lindsey, 3 F.4th at 40-41.

**CONCLUSION**

All told, we are not convinced by any of Orlandella's five arguments. Having written at length above, our conclusion is short and to-the-point: <u>affirmed</u>.